Good afternoon, Illinois Appellate Court, 1st District Court is now in session. The 6th Division, the Honorable Justice Sharon Johnson presiding, case number 23-0078, Cheryl Wilson v. University of Chicago Medical Center. Thank you. Good afternoon. Welcome, and I'd like to begin by introducing the panel members. I'm Justice Sharon O. Johnson, and I'm joined by my colleagues, Justices Michael Hyman and Justice Sanjay Taylor. You'll each be given 20 minutes in which to present your arguments, during which we may or may not interrupt and interject with questions. Will the appellant's attorney please state your name for the record? Good afternoon. My name is Michael Baird, and I represent Cheryl Wilson. Okay, so you'll have 20 minutes in total. Would you like to reserve any of that time for rebuttal? I would like to reserve five minutes. Okay, very good. And can I have the appellee's attorney's appearance for the record? Yes, good afternoon, Justices. My name is Robert Larson, L-A-R-S-E-N, and I represent the University of Chicago Medicine and University of Chicago Medical Center. Okay, thank you very much. You may begin, Attorney Baird. Thank you. May it please the Court. This is an unusual medical malpractice case because, apparently based on the lack of any appellate court decisions on the question, Dr. Blair admitted fault, said that he made a mistake, said that he was taking full responsibility after telling the patient's fiancée that the incident occurred because he pushed too hard. There are no Illinois decisions that I was able to find that dealt with the question of an admission made by the treating physician of fault. When did he push too hard? He said that he pushed too hard during the course of the procedure. Which course of the procedure? The procedure was the attempt to deal with the mitral valve in the left atrium of the patient's heart. In order to get to that location, it's necessary for the doctors to first enter the right side of the heart and to push through the septum that is in between the left side and the right side. Did he push too hard going through the spectrum? Septum. Septum. Or, because the way I read the testimony, nobody talked about pushing too hard in the left atrium. I think in order to understand Dr. Blair's comment to the patient's fiancée about pushing too hard, it's necessary to talk about what we can tell from looking at the medical records. What we're looking at here is a summary judgment motion because you did not have an expert witness. And that question is different with regard to the testimony of the fiancée. To me, the key issue here is whether you should or should not have had that expert. So, with regard to the expert, I think that's the one you should be addressing first. Isn't that the most important issue here? The most important issue is what happened and who is responsible. And I believe we can tell both. No, no, wait. How could that be the issue? The issue is whether you had testimony on the standard of care. Isn't that the issue? That is the issue that the defendants raised. However, I believe that there is evidence as to what the standard of care requires, and I believe it comes from the defendants. Okay, now we're getting some place. Okay, so let's talk about that. Where does it come from, the defendants? Dr. Blair and Dr. Shah both testified that in order to avoid puncturing the right side of the heart, it's necessary to use the appropriate amount of strength. You are pushing a needle through an area. The needle goes through the septum. The septum then, the needle is then withdrawn, and the device is pushed through the right side into the left side. Dr. Blair and Dr. Shah agree that you must use care when pressing the needle through the septum. That's not exactly, that's correct on the spectrum. Please say, excuse my lack of medical. We can call it the wall between the two sides if you wish. That might be easier for me. I'm not sure, I'm sorry. Septum. But let me read to you what you did not have in your brief, which the defendants did have in their brief, in which to me was a major omission with regard to clarity and forthcomingness on your part. And that is on page seven of the defendant's response. There is a conversation where it says that Dr. Shah was asked, could the left atrial wall be punctured because a doctor did not use a reasonable degree of care? A left atrium wall could be punctured even if the physician uses all the care he or she tries to muster. If a doctor failed, question, if a doctor failed to do what a reasonably careful doctor would do during one of these procedures, could that failure to use care result in the puncture of the wall of the left atrium? Answer, and I guess what I'm trying to answer is whether a physician is reasonable or not reasonable, competent or reasonable, these complications can still occur. So we don't have any testimony on the issue here with his, not the spectrum, but the left atrium. And as to that specifically, he said, even a reasonable physician who's competent, these complications occur. And they both, and so did the third doctor who testified, they all had said something similar to them, didn't they? Not exactly that. No, they didn't exactly say that. Basically, what they did say, though, was that they failed to use a reasonable degree of care in pushing the needle through the wall, which is called the septum, that they could puncture the outside wall of the left atrium. They don't say that. Tell me where that is said. Where in the deposition is that said? Let me pull up my copy of my brief, and I can hopefully give you a page citation. Dr. Shaw said that a physician has a duty to use reasonable care to avoid puncturing the wall of the left atrium. He said if a physician does not use reasonable care, it is possible that they could puncture the wall. That's on page 651. If a doctor is not careful, it would increase the chances of a complication like this occurring. Also on 651, Dr. Shaw admitted that some mechanical force must be exerted against the needle to puncture the septum. On C647, it raises the possibility of a physician using too much force. This testimony uses a lot of nebulous terms, which would lead me to infer that even the most careful physician could puncture the septum. Isn't that correct? The defense is arguing that even the most careful physician could puncture the septum. I'm arguing that Dr. Blair pushed too hard, and his pushing too hard caused the needle to follow through the wall of the septum and into the left wall of the atrium. I understand what your arguments are, but that passage that you read would lead me to infer that you said it could or it may puncture the septum. Those words lead me to believe that even if you are careful, and I think this is what Justice Hyman is getting to, is that we don't know. If he had still been the most careful physician, it is possible that he could have still punctured the wall. That's why the admissions of Dr. Blair are so important. But he's not the expert. So if he had an expert, our expert could opine on that. Dr. Blair is an expert on the subject, and Dr. Blair does say, I'm sorry, I made a mistake, I pushed too hard. Was he declared an expert by the judge? The defense has offered Dr. Blair's opinions that he complied with the standard of care as expert testimony. He would only be in a position to express an opinion on whether or not he provided expert care if he were in fact an expert. There's no controversy in the case involving whether or not Dr. Blair would qualify as an expert. But the point behind it is that Dr. Blair, you just can't set aside his admission that I was at fault, I made a mistake, I pushed too hard. Why can't we put that aside? Why isn't that, as Johnson was saying, he does not say that it had anything to do with the atrial. He said the spectrum. And the fiancee did not know anything else and not have any other specifics. That is not the situation here. You're combining these two areas as if it's all one and whatever is said as the one applies to the other, aren't you? No, I think you have to start by understanding what happened. What happened with this patient was that- Mr. Baird, can I, I do want to pick up on that, what happened. Because, and I appreciate the diagram in your brief. It was helpful for me to visualize this, but I want to make sure that everyone's on the same page about what happened. So if I understand it, the medical device was inserted and went up one chamber. And then a needle was used to puncture a hole within the septum, which is the part of the heart that separates the various chambers. And your theory is that the physician pushed too hard. And as a result, the needle went through the septum, traveled across the chamber, and then punctured the outer wall of the heart. Is that correct? That is correct. Okay. And so in support, you rely on, I think, two things. One is the admission of the doctor, at least the testimony of your client's fiance, that the doctor said he admitted fault, he apologized. And then second, you rely on the testimony of the physicians that a failure to exercise care can lead to this type of injury. And I guess the question in my mind is, does that rise to the level of what we would necessarily require in order to create a genuine issue material effect? Because saying that it can isn't necessarily saying that it did in this instance. And that's where I think really the issue lies. So if you could speak to that. Sure. Thank you. I think, first of all, we are talking about analyzing the evidence on the question of summary judgment, which makes us start with the proposition that the evidence needs to be seen in the light most favorable to the non-moving party. We understand that. So when the medical records say that the transeptal needle inadvertently caused the injury to the left atrium wall, which is what they say, Dr. Shah, in his records, five times said... Well, there's no dispute about that, right? I mean, there's no dispute that the wall was perforated. The question is a standard of care. And the defense theory is that it's a known risk. And the question that I have is, what evidence do you have to indicate that this was either not a known risk or that the injury occurred because there was a breach of the standard of care? Well, the doctors both say that the way you avoid having the needle come in contact with the wall of the left atrium is to not use too much force. The second thing they say is that you need to see where you're going. And Dr. Blair said, and Dr. Shah also said, that they were not able to see when the needle hit the wall of the left atrium until they switched the ultrasound machine and put in their Philips machine that they use normally and substituted it for the Siemens machine that was being used as a demonstrator. So both Dr. Shah and Dr. Blair said that they were not able to see the needle in the vicinity of the wall of the left atrium until they switched from the Siemens machine to the Philips machine. Let me go back a little bit, because as with your brief, you seem to be smooshing a lot of facts together in a very broad sweep. Dr. Shah, page 625 at deposition, page 50, lines 4 through 13, explained that the metraclip sheath may have been the thing that punctured the wall of the left atrium. You agree he said that? I agree that he said that. But he did not believe the transeptal puncture did, which is what you're talking about, is a transeptal puncture was when too much force going through the spectrum. He also said, this is a quote, to the best of my recollection, and my understanding, is that this may have happened as we were passing the metraclip sheath across the spectrum and into the left atrium. That's what he said in his deposition, but what did he say in his medical records? Dr. Shah wrote a medical record that said five times that the problem occurred as a consequence of the transeptal needle. Dr. Shah was not the only one. The ultrasound technician said reviewing the images shows that the likely cause was the transeptal needle. So I understand and I agree that Dr. Shah says different things in his deposition. But this is a situation where, from a practical point of view, when Dr. Shah says five times in his operative report that it was the transeptal needle that perforated the wall of the left atrium, that is evidence. I don't think he said that. Again, I don't think he actually said what you say, and Dr. Blair definitely did not say that, did he? Dr. Blair didn't have any comments on that subject, but I can read to you what Dr. Shah said in his medical record. Okay, but what we're talking about here is trying to get a jury to understand this. And we're having trouble understanding it from what you're talking about right now based upon the depositions, which it goes to the heart of this issue, which is you do not need an expert under the Supreme Court law, which we have to follow, if it's so obvious, like leaving a sponge in a patient after surgery. This is very complex surgery, very difficult. What you are saying is the testimony is all over the place. It's not like leaving something in a body, isn't it? Very different, and there's a much more complex situation. It is a complex situation, but here's Dr. Shah's question. How is this like leaving a sponge in the body? Because that's what we have to compare it to in order for us to rule in your favor, isn't it? It's like leaving a sponge in the body when the doctor says it was my fault, I made a mistake, I pushed too hard. And Dr. Shah wrote, quote, the transeptal puncture inadvertently punctured the left atrial free wall in his operative report. He's not leaving any wiggle room. He says the transeptal puncture inadvertently punctured the left atrial free wall. The ultrasound technician says imaging revealed transeptal needle likely perforated the left atrial free wall. So in a summary judgment motion, I think with the light in the light most favorable to the plaintiff, we must conclude that the left atrial perforation was during transeptal puncture, and that the transeptal needle likely perforated the left atrial free wall. All right, well, let me read to you from the deposition of Dr. Shah, page 154, lines 13 through 18, which you did not cite in your brief, incidentally. We had to keep going back to the record to find out what you left out. Question, this is to Dr. Shah. Could the left atrial wall be punctured because a doctor did not use a reasonable degree of care? Answer, the left atrium wall could be punctured even if a physician uses all the care he or she tries to muster. So that does not comport with what you just told us. So again, we are reading the transcript and looking at what they said, not your summary of what they said. I'm reading to you from the transcript of Dr. Shah's operative report, which he signed. I'm talking about the deposition testimony. The deposition testimony is going to get you over that hurdle on the experts. Again, as all of us justices have alluded to, this is about experts, right? You have an expert that explained this to the jury. You say, I don't need one. I have these doctors, two doctors. And you're trying to tell us somehow that these doctors have said enough to get you over the hurdle of an expert. And I'm trying, you know, all of us are trying to figure out how you do that and how this is like a sponge being left in the body for a jury to figure out. Because for everything that you say that was in one, was in a document, they're testimony that says something different. So where is the standard of care? When he even says that you can use a standard of care as carefully as you can muster and still puncture it. That's the doctor that you're relying on. Actually, the doctor I'm relying on is the one who wrote the report. That's Dr. Shah. And that's what I'm. Encephalopuncture. That's my testimonies from Dr. Shah. So you are relying on Dr. Shah. You're not relying on Dr. You're telling me now you're not relying on Dr. Blair. I'm relying on what Dr. Blair said to the patient and to the patient's fiance. I'm relying on what Dr. Blair and Dr. Shah both said in their records. Okay. Dr. Shah and Dr. Blair. So you're saying there's nothing to do in their testimony. I'm not saying it doesn't have anything to do with their testimony. Their testimony. If the case were to go to trial, their testimony would be on would be. There'd be a lot being said. Can I ask you, I want to pursue this issue of the applicable standard of care. And granted, there may be some inconsistencies between. The physician's reports and their deposition testimony. But what is the applicable standard of care that you're advocating? Today. I'm advocating that the standard of care requires the physician. To use care in the amount of force that they use to push. The transeptal needle through the septum. So that it does not follow through and hit the left. Wall of the atrium. So, in other words, to state it differently, you're saying. That the standard of care. In this case is that a physician. Should not use so much force. In pushing a needle through the septum. That it causes a perforation on the outer wall of the heart. Is that a fair way to say it? That's a fair way to say it. Okay. And then what's the best evidence you have? Coming from. Either the deposition testimony. I think it's relying on deposition testimony. Because the reports simply say what happened. It doesn't really talk about the standard of care. The standard of care must then flow from the deposition testimony. So what's the best. Piece of evidence you have. What's the best admission you have from the doctors. Dr. Blair said to the patient. It was my fault. I take full responsibility. I made a mistake. So are we to infer from that admission? A fault. That. The standard of care is such that we just. Or I just articulated to you that you agreed with. I do. And I think the re I mean, look at it this way. If this was an auto accident. And I realize auto accidents are much different than medical malpractice cases. Well, let's say the cars crash. And the driver of the car behind gets out of the car and says, I'm sorry. I made a mistake. It's my fault. I pushed down too hard on the accelerator. And the driver of the car behind says, I'm sorry. I pushed down too hard on the accelerator. Well, so the difference there, of course, is a lay person can. Understand that. Whereas here. You know, medical malpractice is generally not within the. You know, Not with the knowledge of your average. Lay person. That's true. But Dr. Time has expired.    I think there's a lot of things that need to be. Reserved. You did reserve five minutes. So I'd like to give the appellees council an opportunity to. Make his argument. Thank you very much. Justices council. Please the court. I learned a long time ago that when things are going away, don't argue too much. I think the justices have pointed out exactly what the concerns are that we have with this case. This matter involves a plaintiff and counsel who were given multiple opportunities to disclose an expert. And elected not to do so. And after failing to take advantage of those opportunities, they now ask this court to allow them to present. What I think you've all recognized is an extremely complex. Medically complex case to the jury. And just let them figure it out. Because somebody said, allegedly. It's my fault. As if anybody who. Has a bad outcome. Doesn't try to sue the family by saying, I'm sorry. I'm sorry. It's my fault. Of course it's someone's fault in the sense that they are the person. Doing the procedure. But that doesn't mean negligence. Well, what. Oh, go ahead. Well, what did Dr. Blair say was his fault? As you. As a testimony. It was from the. Fiancee. Well, exactly. There's, there's no evidence of that whatsoever. There was a generic statement. Doesn't say what was. Supposedly his fault when it happened. Mr. Larson, he did. According to the fiance, he did say I pushed too hard. That's according to the fiance. Yes, that is true. Justice Taylor. Although again. In what part of the procedure where he pushed too hard. Exactly what happened? None of that is explained. And. Counsel, isn't it obvious that. Something went wrong and that the physician was, would have been the responsible party. If this was a case and, and this is. Critically important point. And while I'll get to the case of Kevin. If this was a race, it's a case. And they had an expert who would come in and say, this sort of injury does not occur in the absence of negligence. We'd have an argument. There is no such thing. And so. But this isn't a race. It's a case because, you know, the. The plaintiff is relying on your own clients or your. The physician's admissions. He's not saying that. You know, this is what we learned in law school. I, I, you're, you're correct. That plant is trying to do an end around on race. If I just say, well, we're going to have somebody come in and say, the doctor said he was at fault. So just to summarize, to summarize what you just told us. They never raised racism. Correct. So they can't raise it. They didn't raise it on their appeal. They didn't raise it before the trial court. That is not at stake in this case. That that's the bottom line here, right? That is correct. Justice. Okay. Thank you, Simon. My point is that they seem to be trying to do an end around on that by saying. Exactly what falls against the case of chemnitz. That says. A mere mistake that results in injury is not. A deviation from the standard of care deviation standard of care is a legal concept. It has to be supported by expert testimony, unless, as you pointed out justice.   I think that the, the, the issue is. The issue is so clear and free from doubt that the ad, the can of the average juror would be sufficient. To identify them. And to suggest that the average juror would know how to do a transceptal perforation and a cardiac procedure of this complexity. And in exactly how much force is necessary or appropriate. For what recognized complications there are that can happen in the absence of negligence. As both doctors testified, this can happen in the absence of negligence is, is crazy. There's no possible way. And frankly. When his council did not really rely on this concept of. Of the common knowledge exception. It doesn't seem to be plead or argued here. But certainly it shouldn't be because there's no way the average juror this, any of this is within the common knowledge of the average juror. So we're laughing. I want to clarify something you said. Answer. Justice Taylor and that justice Taylor, I think. Indicated before, but. With regard, there's two things. We have depositions and we have. Documents. You agree. Is there anything in those documents at all? That could be a basis. Or a, an expert. For the doctors having said what the standard of care is in this situation. Is there anything. No. What basis do you, are you saying that? I know he's trying to make a negative, but. And what basis is, am I saying that the medical records don't speak to the standard of care? They said, we don't talk about that. They talk about what happened in every medical procedure. And I've been doing this a long time, every, every. Operative report talks about what happens, but they don't talk about the standard of care.  The standard of care is, is including the complications that have occurred during the procedure. But that a complication is not the equivalent of, of a deviation from the standard of care. It's not the equivalent of professional negligence, which is what plan has to prove. Either directly saying this is what happened and it was against the standard of care. And they have to define what that standard of care is. Or they have to say, it doesn't matter exactly what happened. This just can't happen unless something was negligent. And it has not done either of those things here. They're relying upon. I tried to articulate. The plaintiff's theory of the standard of care. And I wanted to do that again and ask you if you agree. That's the applicable standard of care and the standard of care, according to plaintiff is that. When inserting the needle through the septum. You cannot push so hard. As to then cause a needle to. Perforate the outer wall of the heart. Would you agree that that's the standard of care in this case? Absolutely not. So what, what is the standard of care? Well, I shouldn't ask you that the plaintiff's theory relies on. The admissions of the physicians in their depositions. In which they. Acknowledge that if you push too hard. When. Trying to push that needle through the septum. You can cause. The. Outer wall of the heart to become perforated. That's I think one of the things they rely on. In addition to the. Acknowledgement of fault. Could you speak to the deposition testimony and why that does not. Establish the standard of care here. Well, I think justice. Maybe yourself justice Taylor. I've already quoted the relevant pertinent testimony. Of both doctors, which is you can do everything appropriate. Including exercise. Sizing appropriate force. You're talking about small structures in a beating heart. Done with remote visualization, using a trans esophageal echocardiogram. To identify exactly where you are. And they testified that sometimes there are blind spots that you're working through. And so, yes, a perforation that goes through into the wall of the heart can happen. And it can happen without negligence. So to say that the standard of care is if you push hard enough that you. Cause an injury. That's negligence is by definition standard of care. It's the polar opposite of what cabinet says. And it's actually very similar to the fact pattern in chemists. Where the plaintiff's expert couldn't say exactly what happened, but gosh, there was an injury. So it must've been, he must've pushed too hard. So I think it's important to remember. And discuss what is not disputed and what is not before this pool. We know plaintiff does not have an expert. We know he's had plenty of opportunities to name one. We know they did not. And we know that. I think he said that the doctors. Shaw. And. The doctors were the experts. And to the extent that the doctors were the experts, they both said they complied with the standard of care and explain what the standard of care was. So they're relying instead upon this vague notion of an alleged. Admission of fault without any explanation as to what that means. In the context of this very complex procedure. And in fact, The doctors testified that they didn't think it was the needle that caused. The perforation that it may have been one of two clips. Or, or catheters that were used during this process. And, and frankly, as. What about the medical records? Let's say it was the needle. Mr. Baird cites the medical records. He says in five instances.  And there's actually, of course. I don't know if the plaintiff's counsel doesn't cite any testimony setting forth the foundation for those records or how they were interpreted by doctors Blair and shop. But my recollection, the testimony is they said it was actually written by resident. It wasn't intended to. Explain every aspect of what happened here. And they actually explained. That sounds like something you would argue to a jury. It would be if there was expert testimony on the other side of it. If there's somebody saying this, this is the basis from my opinion. The plaintiff's counsel can act as his own expert. And, and the only quote unquote expert testimony from the doctors is that they comply with the standard of care. And the theory that's being posited by plaintiff's counsel in this case is not what happened. So this, this case is really, it's not a sponge case. It's not a razor. It's a case. It's a case where the plaintiff. For better or worse is relying on a testimony of the defendant. Or of the doctors. I don't know if they're defendants in this case, but relying on a testimony of doctors to establish the standard of care. And so it ultimately comes down to whether they admitted. That what the standard of care was in this case, that's what it comes down to, isn't it? Well, I think it's respectfully a little further than that. They attempted to define the standard of care for plaintiff's counsel. And I think justice, I'm incited that extensively. And we talked about the fact that it's not, you avoid injury. Because that's again, an impossible standard. This is a complex procedure with recognized risks of things such as a perforation of the atrial wall. And of course, if a doctor has an adverse outcome, they're going to feel sorry. They're going to want to take responsibility because they're the ones who did the procedure. But that is not the same thing as saying I deviated. So there, there is testimony that the doctors said something about all that they can muster. I don't know what that means, but let's just assume that there's that testimony. I don't think that Mr. Barry's relying on that. What he's relying on is testimony of the doctor that if you put too much pressure on the septum, you can perforate the outer wall of the heart. Now, my question to you is, is that sufficient in this case? Is a may or can enough to get you to a jury? Do you need more than that to get to the jury? I think you can anticipate my answer, which is yes, of course you need more unless it's a race. And what is it that's required that you would require some admission that in this case that it did. No, you would have to have testimony from an expert that says you cannot penetrate and push hard enough that the needle or the catheter goes into the wall without being negligent. If you if you go there, by definition, you've gone too far. And nobody said that. And and again, that's that's the race theory that they don't have here. But if it's trying to define negligence by the injury that occurred and that's what can't be done. But I think that's a critical point you made. I want you to repeat that because I want to make sure that I understood. Sure. If it is trying to make the argument that because there was an injury here, there must have been negligence and and yet not do that by pleading racist. Well, that wasn't the point you made. I'll listen to it. I'll listen to the argument. I'm sorry. I may have forgotten how he worded it. I thought it came out real well and I lost it afterwards. What about the fact that in their opening brief, they have a whole section with the title, both Dr. Blair and Dr. Shaw now claim they don't know what went wrong. What's your reaction to that vis-a-vis the standard of care, if anything? Well, they both testified to what they think may have happened and that what happened didn't comply, wasn't a deviation from the standard of care. But again, the burden here is with plaintiff. If plaintiff had more definitive evidence of what happened and that it was negligent, it was plaintiff's burden to bring that forth with the many opportunities plaintiff had to do that. And then plaintiff did not do that. So plaintiff is trying to create minor differences and frankly, doing so by misquoting the testimony of the two doctors. We pointed that out in our brief that, for instance, plaintiff didn't inform this court that there were two different catheters that are used during this testimony of Dr. Shaw and Blair and respectfully mislead this court that there was some sort of conflict in the testimony of the two of them. And on the critical issues in this case, they were very much on point. This is a recognized complication of the procedure that was performed, could have happened this way. And so really what it comes down to, the only thing plaintiff has is, gosh, he said, I know he doesn't admit it, but he said he pushed too hard and it's my fault. Mr. Larson, the point you made, which I think, and I want to make sure I understand it, is that the standard of care that the plaintiff would have to offer to get to the jury is that you can't push too hard without, and puncture the wall without reaching the standard of care. Is that your argument? Yes, Your Honor. Okay. And we'll ask Mr. Baird to respond to that. Can you also address, counsel, the lack of visualization? Yes. So, Justice Johnson, counsel sort of on his own theory puts in there that the defendants testify that you must visualize every aspect of the procedure. That's not what they said. And we pointed out in the brief where that is a misrepresentation of what the doctors said. Yes, you use visualization equipment such as a transesophageal echocardiogram to try to identify those areas. But as the doctors testified, there are times when you will not have the ability to fully visualize. And they're making every effort to do so, but neither of them said, and gosh, at any point you lose visualization of anything, you've got to stop. There's no such testimony. Again, the plaintiff could have called an expert to say that, but he didn't. And he misrepresented what the doctors said in that regard. But I do think that's an important point. You can conclude now, counsel. I'm sorry, Your Honor? Would you like to give a concluding statement? You're just about out of time. I can do that. Thank you very much. I think the court has recognized the deficiencies in the plaintiff's case. I think plaintiffs are trying to establish a standard that would essentially say, in a very complex medical malpractice case, if one of the plaintiffs simply says, gosh, I remember the doctor saying it's my fault, I made a mistake, that gets you to the jury. You don't need an expert. You don't need to explain exactly what that means. And if that's the standard, this is going to be a very different practice in Illinois in how people pursue medical malpractice cases. There's a reason why a long litany of cases say, except in the common knowledge exception, you need to have expert testimony to support the elements of standard of care, breach of standard of care, and that the specific breach articulated approximately caused the injury being claimed. When a plaintiff doesn't have testimony on those elements, they have one claim statement by one doctor that is ambiguous and then want to throw all those other elements of the case out. And I don't think that should be permissible under Illinois law. I think it would be a mistake to allow the law to go that far in that direction. If I may, one little question on something you just raised that hadn't come up before. You mentioned proximate cause. Nowhere in their opening or reply brief are those two words used at all. There is no reference to proximate cause. What, if anything, does that tell you? Well, I think, Justice, that means that they don't have the evidence to support that. And what's the ramifications of that? That's what we're talking about. That their appeal is over. That the trial court properly recognized that as a failure of proof on their part, a gap, as in the Chemnitz case and related cases, as is the fatal gap in proximate causation that defeats their claim. Okay. Thank you very much. Attorney Barrett. Thank you, Justices. I'm going to mute yourself, Coles. I did that. Thank you. Let me address the proximate cause issue first. The records clearly show that the transeptal needle punctured the left wall of the atrium. There's no issue as to what caused the puncture of the left atrium. Proximate cause, what was the cause of the puncture of the left atrium? It is, according to the medical records, the transeptal needle. So saying how it became punctured, there's evidence to support that. And if you're wrong on that, you lose, is that correct? If we find that that's not what was stated, first of all, the records were from a third party that wrote them later on. So they weren't admissions by these doctors. Well, basically it's not true because Dr. Shah read and signed the reports. This is Dr. Shah's report. It was dictated by an assistant. But the way they do this is the assistant does the dictating, the doctor reviews it, makes any changes that are necessary, and then signs it once those changes have been made. And he made no changes to the report that said that the transeptal needle punctured the left atrial free wall. Well, shouldn't we ignore what you just said? Because there's nothing in your briefs about proximate cause. In fact, you use the phrase probable cause twice. Probable cause is a criminal doctrine. I don't understand. What does probable cause have to do with this case? I don't even answer to that. I don't know what references in the brief you're talking about, but I'd like to move on because I've only got a minute or two left. Well, we'll give you a few extra minutes because I think it's important. It's on page six of your reply. F, probable cause is shown. So you never talk about proximate cause at all. You agree to that? The word proximate does not appear in the brief. Okay, thank you. But whether or not proximate cause is shown in the deposition and in the testimony is a completely different question of whether or not I used the term proximate when I was discussing the cause. The other issue I wanted to get to is we've been talking about standard of care and counsel cited the Chemnitz case. I also discussed the Chemnitz case in my reply. And I think as it relates to what the standard of care is, Chemnitz is pretty important because in Chemnitz, the standard of care was found to be the surgeon should not use too much force so as to avoid causing an injury to the nerve. The appellate court in Chemnitz found that that was a sufficient guide to establish a judging of the defendant's conduct. That's on page 673 of Chemnitz. So it's very similar to what I'm talking about here, using the sufficient not to use too much force so as to carry through a septum and cause an injury to the outside of the heart. Did the plaintiff have an expert in that case? They had an expert, but the expert said that the standard of care requires that the surgeon not use too much force to avoid injury and causing the nerve. Both doctors Blair and Shaw said that in our case. Well, Mr. Larson says that what's missing in your case is evidence that an injury of this nature that is perforating the heart wall is not possible unless there is a, um, I think it's breach of the standard of care. There must be something that the doctor does wrong that causes this injury. You know, I'm using just the common term, doing something wrong. And I'm using that term because Dr. Blair admitted that he was at fault for this. Now, fault doesn't mean I just made a mistake. Fault means negligence. Fault means. How do we know that? Well, wait, wait, wait. No, no. Paul, where do you, what case are you relying? We're in your brief. Wherever you ever argued that fault equals negligence. Is that. I'm sorry. I'm sorry. I pulled a citation for the definition of the word fault. And it does appear in my brief. I'm just trying to find it quickly. No, but you don't know what, what, when he said. We don't know if he said fault. We don't know what he said, do we? He said mistake. I'm sorry. No, he said fault. I am at fault. I made a mistake. I am fully responsible. The world. We're not sure. I mean, he, again, there was very, we don't know what he was referring to. First of all, let's go back to what cabinets. So. You're saying that's very important. So our reading of chemists. Years. Are you saying that decides this case, whether we believe it goes for your side. Or the other side. No, I'm not saying that. I'm saying. The standard of care that the court found to be sufficient is similar to the standard of care that we found here. The difference in chemists in our case is that in our case, Dr. Blair admitted fault. He said fault. According to blacks. Law dictionary. The term fall means the intentional or negligent failure to maintain some kind of standard of conduct. When that failure results in the harm to another person. And what was his. What was the fault that he did? Dr. Blair pushed too hard. And the needle caused a. Cut or a perforation of the left side of her heart. Dr. Blair admitted that fault. Dr. Blair said, I take full responsibility for that. That's not in cabinets. You're saying that. It's not, do you agree that it's not enough to prove that he made a mistake? Yes or no. I agree that it's not enough to prove that he made a mistake. Okay. And that's what I figured you'd say. So, and, and the reason you say that. Is because of what he told the fiance. Is that correct? No, what I'm saying? The reason I'm saying that is because that's what I believe the law is. You know, practically. If a doctor makes a mistake. It's not necessarily something that means negligence. And I'm not asking you to find that I've proved my. I've offered evidence of mine. Necessary elements of the case. By the word mistake. I'm saying the word fault. And the word I take full responsibility is more than simply saying I made a mistake. I made a mistake.  I made a mistake. Dr. Blair's didn't say. I pushed and it followed through. He said, I pushed too hard. I'm sorry. The bottom line is that I believe that there is evidence when taken in the light, most favorable to the plaintiff. To show that dr. Blair pushed too hard. That he made a mistake and we know that it was a faulty mistake. And I'm not asking you to find that evidence. I'm asking you to find the evidence. Because the word fault means an intentional or negligent failure to maintain. Why is that not a race? It's a argument. It's not. It's a race. It's just, we don't know what happened. But something must've happened. Here. We know what happened. No, we don't. I don't know what happened. In fact, Doctors don't even know what happened. They don't know what happened. And that's the title in one of the sections of your brief. They don't agree on exactly what happened. Dr. Blair. Now. Council, if you can conclude now, we do have a two o'clock argument. Understood. Thank you. In summary. I think you. You need to understand that you. You can't just simply discard. Dr. Blair's statement to the plaintiff. That he was at fault and he takes responsibility. I know it's inconvenient. To have a situation where a person says something. And you now have to say, well, now we can't, all the cases in the country are going to have the doctors admitting fault, according to the patient. But that's just like any sort of a, he said, she said situation. She said, dr. Blair said, I'm at fault. The key here though, is. Dr. Blair doesn't deny it. When I asked him, did you use the word fault? Did you use the word responsibility with. With your talk to Cheryl. And he said, I don't remember. I think that's really all you need to know as to whether or not that was said to the patient. Thank you. Thank you very much. I think you both did an excellent job and arguing zealously for. Your respective clients and we will certainly take it under advisement and issue a ruling accordingly. Thank you so much. Thank you. Well, thank you. Hold on justice Johnson.